IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 18, 2012

**STATE OF TENNESSEE v. DWANIKO MARTEZ SUDBERRY**

**Appeal from the Criminal Court for Davidson County**
**No. 2008-C-3011      Mark J. Fishburn, Judge**

---

**No. M2011-00432-CCA-R3-CD- Filed November 14, 2012**

---

A Davidson County jury found appellant, Dwaniko Martez Sudberry, guilty of three counts of reckless aggravated assault, one count of attempted aggravated child neglect, and one count of reckless homicide stemming from the death of his infant daughter. The trial court merged the convictions of reckless aggravated assault with the conviction for reckless homicide and sentenced appellant to four years. The trial court sentenced appellant to twelve years for attempted aggravated child neglect and ordered the sentences to be served consecutively for an effective sixteen-year sentence. Appellant contests his convictions and sentences on the following grounds: (1) the convicting evidence was insufficient; (2) the combination of his convictions offends the principles of double jeopardy; (3) the trial court erred in failing to order the State to make an election on the offense of aggravated child neglect; (4) the trial court erred in admitting certain expert testimony; and (5) the trial court committed multiple errors in sentencing him. Following our careful review of the record and the briefs of the parties, we discern no error and affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROGER A. PAGE, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ALAN E. GLENN, JJ., joined.

Dawn Deaner, District Public Defender; Jeffrey A. DeVasher (on appeal); and Gary C. Tamkin and Jonathan F. Wing (at trial), Assistant Public Defenders, Nashville, Tennessee, for the appellant, Dwaniko Martez Sudberry.

Robert E. Cooper, Jr., Attorney General and Reporter; J. Ross Dyer, Senior Counsel; Victor S. Johnson, III, District Attorney General; and Katrin Novak Miller and Brian Holmgren, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I. Procedural History

On September 15, 2008, a Davidson County grand jury indicted appellant for three counts of aggravated child abuse, one count of aggravated child neglect, and two counts of felony murder (one count during the perpetration of or attempt to perpetrate aggravated child abuse and one count during the perpetration of or attempt to perpetrate aggravated child neglect) for his involvement in the death of his infant daughter in June of 2008. Before submitting the case to the jury, the trial court required the State to make an election of the facts underlying the counts of aggravated child abuse. The State elected the following offenses for the counts of aggravated child abuse: for Count I, appellant caused blunt head trauma to the victim, including bleeding of the brain, subdural hemorrhages, subarachnoid hemorrhages, damage to the axons of the brain, and multiple subgagleal hemorrhages; for Count II, appellant caused blunt trauma to the victim's abdomen, including bruising and lacerations to multiple organs; for Count III, appellant caused multiple fractures to the victim's ribs. The trial court did not require the State to elect facts underlying the count of aggravated child neglect.

Following a trial, the jury returned verdicts of guilty for the lesser included offenses of three counts of reckless aggravated assault, one count of attempted aggravated child neglect, and one count of reckless homicide (as a lesser offense of felony murder committed during the perpetration or attempt to perpetrate aggravated child abuse). The jury acquitted him of felony murder committed during the perpetration of or attempt to perpetrate aggravated child neglect. At sentencing, the trial court merged the three convictions for reckless aggravated assault with each other and with the conviction for reckless homicide. The court sentenced appellant to the maximum terms of four years on the merged convictions and twelve years on the conviction for attempted aggravated child neglect and ordered that the sentences be served consecutively. The trial court denied appellant's timely motion for new trial.[1] This appeal follows.

---

[1] Appellant's fourth point in his motion for a new trial alleges that the trial court erred in denying his pretrial motion to dismiss counts two and three of the indictment because they alleged the same conduct. Although the statement is unclear and further argument in court did not clarify it, this court liberally construes this claim of error as alleging the double jeopardy violation he has briefed as issue number two on appeal. Additionally, appellant did not challenge the length of his sentence or imposition of consecutive sentences in his motion for new trial; notwithstanding, we will review his sentencing arguments on appeal. *See State v. Boxley*, 76 S.W.3d 381, 390 (Tenn. Crim. App. 2001).

## II. Facts

The State's first witness at trial was Helen Sneed,[2] the victim's maternal grandmother. Helen testified that the victim, Shiloh Sneed, was born on August 6, 2007, to her daughter, Vanessa Sneed. During the time in question, Vanessa, the victim, and Vanessa's other two children lived with her. When Vanessa was at work, Helen was the victim's primary caregiver. Helen identified appellant as the victim's father and Tiara Sudberry as appellant's mother and stated that appellant lived with his mother during this time. She further testified that when Vanessa was not working, Vanessa and the victim would go to Ms. Sudberry's home to visit appellant and his mother. On the weekend preceding the victim's death, Helen attended a retirement celebration at her church for her brother-in-law, and Vanessa and Shiloh visited appellant and his mother for the weekend.

On cross-examination, Helen admitted that she and Vanessa had several disagreements about Vanessa's involvement with appellant because of what Helen observed and how she felt about him. Helen testified that Vanessa spent more time with appellant in the weeks preceding the victim's death but stated, "[T]he baby was with me." Helen explained that the victim was in her care more than ninety percent of the time.

Vanessa Marie Sneed, the victim's mother, testified that she and her two children lived with her parents at the time of the trial. Appellant is the father of one of the surviving children. After becoming pregnant with the victim, Vanessa ended her relationship with appellant but renewed the relationship after the victim's birth because appellant expressed a desire to be involved in the victim's life and to help raise her. Vanessa continued to live with her parents, but she and the victim would sometimes visit appellant for one or two nights at a time. An unrelated individual, Monica Woods, also lived at appellant's residence. On overnight visits, Vanessa slept with appellant in his bedroom; the victim slept in the bed with Ms. Sudberry; and Ms. Woods slept downstairs in the living room. Vanessa admitted that on occasion, she would allow appellant or Ms. Sudberry to keep the victim but "not very often." She testified that she never left the victim completely alone with appellant, and either Ms. Sudberry or Ms. Woods was present.

Vanessa recalled that on Memorial Day weekend, prior to the victim's death on June 3, 2008, her car had broken down, and Ms. Sudberry picked her up after work and drove her to the Sudberry residence where she and the victim spent the weekend. On the morning of June 3, 2008, Ms. Sudberry brought the victim into appellant's bedroom where appellant and Vanessa played with her for a while. Vanessa stated the victim "was kind of fussy, kind of

---

[2] With Sneed being the surname of the victim, the victim's mother, and grandmother, for clarity, we will refer to these witnesses by their first names. By doing so, we intend no disrespect.

-3-

crying," because she was teething, but normally she was a "happy baby." She explained that the victim was in line with all the developmental milestones. She had just begun standing on her own without support, preparing to walk, crawling, and holding her bottle to feed herself. Vanessa explained that on the morning in question, she handed the victim back to Ms. Sudberry and dressed to go to the bank and apply for a loan to get her car repaired. When Vanessa last saw the victim, she was sitting on Ms. Sudberry's bed crying. Vanessa testified she told appellant "to go into the room and see about her." Vanessa and Ms. Sudberry then left the residence around 9:00 a.m., and Ms. Sudberry drove her to the bank. They were away for approximately two to three hours and returned between 11:40 a.m. and noon. While they were gone, Vanessa received a cellular "call, possibly a text," from appellant about a model number on a computer at his residence, but he did not mention the victim at all.

When Vanessa arrived at the home, the victim appeared to be sleeping. She stated the victim was in Ms. Sudberry's room where she always slept, "[a]nd [she] went in the room and glanced at her." She continued, "And as I said, she appeared to be asleep. And so I went back to [appellant's] room and began changing my clothes." Vanessa stated that when she checked on the victim, she was about three or four feet away from her, but she did not touch the victim because she did not want to disturb her sleep. She acknowledged that there was a crib in the Sudberry residence, but there was clothing in it. There was also a crib at her parents' home, but it was not assembled, and the victim slept with her except as a newborn when she slept in a bassinet. Vanessa testified that almost immediately after she finished changing clothes, she heard the appellant scream for his mother, saying that something was wrong with the victim. She stated, "Then all of us ran into the room, myself, Ms. Sudberry. [Appellant] was already there, and Monica Woods." Ms. Sudberry had the victim in her arms, speaking to her and trying to revive her. Vanessa said that from where she was standing, she could not tell if the victim was breathing, "[b]ut just from the way her body was, it did not seem right." They all ran downstairs and Vanessa called 9-1-1, placed the victim on the couch, and began CPR while talking to the 9-1-1 operator. The 9-1-1 operator instructed Vanessa to let someone else administer CPR and to give instructions from the telephone. Vanessa testified she put the telephone on speaker mode and Ms. Sudberry began performing CPR on the victim. A police officer was the first individual to arrive on the scene. He picked the victim up and began giving breaths and chest compressions. The fire department arrived next, and Vanessa assumed a paramedic performed CPR on the victim. An ambulance also arrived. One of the emergency responders asked Vanessa to go outside and she complied. Vanessa testified that she and appellant were escorted to the hospital in a patrol unit. Upon arriving at the hospital, personnel continued efforts to revive the victim, but she died. A police department chaplain escorted them home. As they traveled to and from the hospital, Vanessa stated she did not ask appellant if anything had happened to the victim while she was with him that day. After appellant was arrested and Vanessa learned

-4-

of the reports from the medical examiner, she was forced to leave her parents' home because an order from the Department of Children's Services placed her other children in emergency custody with her parents. She was not allowed to be in the same house with the children. She moved into the Sudberry residence. At that point, Vanessa was still supportive of appellant and did not think he killed their daughter.

Vanessa's opinion later changed, and she moved from the Sudberry residence. After appellant's arrest, Vanessa questioned him about the victim's death. She related that he first told her that the dog was loose and tripped him on the stairs, causing him to fall on top of the victim while he was carrying her. Appellant told her that he did not tell her before because he was scared. Vanessa asked appellant a second time about what happened the day the victim died. Appellant told her he was playing with the victim in the bed, throwing her up into the air and catching her, and the last time he threw her she fell limp in his arms. He told her he performed CPR on the victim, revived her, calmed her down, and gave her a bottle, and then she went to sleep. Vanessa stated that is when she and Ms. Sudberry arrived at the residence. Appellant also told Vanessa that he thought the medical personnel handled the victim too roughly and caused her injuries.

On cross-examination, Vanessa acknowledged that at first, she did not think appellant hurt the victim, and she stood by him because she thought he loved their daughter. She felt comfortable leaving the victim with appellant on the morning of her death because Ms. Woods was also at home. It was a normal morning, and nothing about the appellant alarmed her or worried her about leaving the victim in appellant's care. She recalled that she telephoned appellant around 11:20 a.m., and he told her the victim was sleeping. Vanessa testified that after she returned home, when appellant screamed for help, she entered Ms. Sudberry's bedroom and could clearly see that the victim's lips were blue.

On redirect examination, Vanessa stated that she saw no injuries or bruises on the victim when Ms. Sudberry brought her into appellant's bedroom to play that morning.

Monica Woods testified that she became friends with appellant and his mother through dating one of appellant's friends, and she began living with them toward the end of 2007. She slept downstairs on the couch and kept her clothes in a downstairs closet. Ms. Woods testified she babysat the victim "probably just once. It wasn't many times at all." On the morning of the victim's death, Ms. Woods slept late but was awake when Vanessa and Ms. Sudberry left the house around 10:45 a.m. She then realized they did not take the victim with them. She remained on the couch another five minutes after Vanessa and Ms. Sudberry left. She then went upstairs to take a shower. Ms. Woods testified that she was in the bathroom the whole time that Vanessa and Ms. Sudberry were gone and never heard the baby crying or screaming. Ms. Woods reviewed exhibit photographs and commented that the

house was small, the bathroom shared a wall with both bedrooms, the walls and floors were thin, and when in the bathroom, you could hear noises from the bedrooms. Ms. Woods saw appellant that morning when "he came in the bathroom and set a towel down in there." He appeared normal, and there was nothing different about him. Ms. Woods testified that she was in the house with appellant and the victim during the entire morning, and when she was upstairs, "[she] just heard footsteps walking around."

The 9-1-1 call from the 614 Ashmont Court address was received at 12:02:48 p.m. Officer Dale Tomlin, a twenty-five-year veteran of the Metro Police Department, testified that he was the first person to respond to the scene. He received the call at 12:08 p.m. and arrived two to three minutes later. Officer Tomlin ran into the residence and observed a female administering CPR to a child lying on the floor. The adult appeared to be struggling with the CPR, so she agreed to allow him to take over the procedure. He checked the victim's pulse and listened for breathing. Because he did not detect any breathing, he immediately began CPR until the paramedics arrived approximately two to three minutes later. Office Tomlin left the scene after the paramedics arrived "to go gather [himself] for a few minutes." He testified that pursuant to his sergeant's instructions, he returned to the residence to transport the victim's father and mother to the hospital.

On cross-examination, Officer Tomlin testified that when he initially arrived at the scene, Ms. Sudberry and Vanessa were frantic and panicking. He stated that this was the first time in his career that he had given CPR to an infant. He testified that he found no pulse for the victim. After Officer Tomlin transported appellant and Vanessa to the hospital, appellant shook his hand and thanked him "for doing whatever I did or being nice about it or whatever – whatever his reasons were."

Kevin Thomas Bloomfield, a firefighter-paramedic with the Nashville Fire Department, testified that when he entered the house, his colleague was performing CPR on the victim. During his basic assessments, Mr. Bloomfield determined that the victim's airway was not secure and attempted intubation. His efforts were unsuccessful because the victim's airway was obstructed by blood. He inserted an oropharyngeal tube and continued chest compressions as the victim was placed in the ambulance.

Mr. Bloomfield estimated that in his lengthy career as a paramedic, he administered CPR to infants thirty to forty times per year and has never been advised that an infant suffered any internal injuries from his procedures. He rode in the ambulance with the victim to the hospital, and the victim's condition did not change from his initial contact.

Brian David Himes, a paramedic/special operations officer with the Nashville Fire Department, testified that during the six-minute ambulance transport, he assisted Mr.

Bloomfield with the treatment of the victim and was present at the hospital when the victim was pronounced dead. Mr. Himes intubated the victim and established an IO, a form of IV that is placed through the bone of a child to administer epinephrine and general resuscitation efforts. In intubating the victim, he encountered a small amount of blood in the airway which, he stated, was "very" unusual in his opinion. He could not recall intubating an infant and finding blood in the trachea. Mr. Himes estimated he performed CPR on infants "[a]nywhere from five to ten times a year" and had never been advised of rib fractures or internal injuries inflicted as a result of performing CPR on an infant. Mr. Himes could not obtain spontaneous breath sounds or a pulse during his treatment of the victim and conceded that the victim was essentially dead on first contact except for the CPR intervention he and Mr. Bloomfield were providing.

On cross-examination, Mr. Himes testified that he was not aware that the victim had suffered rib fractures and stated that he had never seen a rib fracture in an infant due to CPR. However, he agreed that no one would have called him and said, "[T]he CPR caused the rib fractures," and that they would have attributed it to something else. Mr. Himes testified that a map error delayed his arrival time, and he admitted getting to the scene later than he normally would have.

On redirect examination, Mr. Himes testified that he has administered CPR to infants who ultimately died from natural causes where there is no suspicion of abuse or homicide and that he has never been contacted, as a result of an autopsy report, to account for a rib fracture.

Randy Kroll, a detective with the Metro Police Department Youth Services Division, testified that his office received a call between 12:30 and 1:00 p.m. informing him that patrol units were responding to a ten-month-old child who had stopped breathing. He and Detective Don Long traveled to Southern Hills Hospital, while two other detectives went to the scene. Upon arriving in the emergency room, Detective Kroll learned that the victim had already been pronounced dead. Detective Long asked him to speak with appellant and ascertain what happened. Appellant told Detective Kroll that his mother and Vanessa went out around 11:00 a.m. Afterwards, appellant picked up the victim, laid her on the bed, propped her up with pillows, gave her a bottle, and went into his room. Appellant told Detective Kroll that he checked on the victim twice, and she appeared to be sleeping each time. The third time appellant checked on the victim was around the time his mother and Vanessa arrived at home. This time, appellant explained to Detective Kroll, the victim did not look right, and as he moved closer to the victim, he yelled to his mother and Vanessa that something was wrong. When his mother and Vanessa came upstairs, they all looked at the victim and said her lips were blue.

Detective Kroll made some notes about his interview with appellant and included them in his report. He attended the autopsy of the victim and relayed the autopsy findings to Detective Long, after which they decided to arrest appellant.

On cross-examination, Detective Kroll testified that appellant was upset and emotional at the hospital, and he allowed appellant time to calm down before they walked outside to talk. Appellant was willing to answer his questions. He further testified that appellant was arrested without incident or trouble and gave a statement immediately.

Detective Don Long of the Metro Police Department Youth Services Division was the lead detective in the investigation of the victim's death. He recalled arriving at the hospital and finding appellant, Vanessa, and Ms. Sudberry there. Appellant became upset and caused a scene sufficient to cause hospital security to be summoned. Once appellant calmed down, Detective Kroll went outside to talk with him, and Detective Long went into a room to speak with Vanessa. Detective Long testified that the next investigative step was a re-enactment at the scene, if the family was well enough and agreeable. Detective Long stated that appellant was ready to participate in a re-enactment.

Detectives Long and Kroll, appellant, and Vanessa returned to Ms. Sudberry's home to begin the re-enactment using a doll to represent the victim and a video camera to film the victim's care while with the appellant. Detective Long testified that after Detective Kroll attended the autopsy, the arrest warrant was served on appellant. Appellant was cooperative and gave a lengthy statement.

On cross-examination, Detective Long acknowledged that he was aware of the autopsy findings when he interviewed appellant and that he believed this was a potential case of child abuse. He agreed with trial counsel that during the interview, appellant told them numerous times that he did not intentionally hurt his daughter.

Dr. Steven Terry Turner, an emergency room doctor at Southern Hills Medical Center, testified that he was on duty June 3, 2008, when the victim arrived at 12:30 p.m. Upon arrival, the victim had no pulse, no spontaneous respirations, and no heartbeat, and for all practical purposes, she was dead when she arrived. However, he and his staff continued attempts at lifesaving or resuscitating efforts for approximately thirty-five to forty minutes. Dr. Turner testified that none of the measures or interventions utilized would have resulted in any type of injury to the victim.

Dr. Turner examined the photographs of the victim and testified that the bruises on the victim's upper chest and face depicted in the photographs were not visible when he first saw the victim. Dr. Turner explained that although the bruises were not apparent in the

emergency room, they could appear in the photographs taken later because "[i]t can take some time for bruising to appear." He denied that anything done at the hospital contributed to the bruises. Dr. Turner further testified neither CPR nor any other medical intervention administered to the victim would have caused the posterior rib fractures or the additional bruising on the victim's side and back that were noted during the autopsy.

On cross-examination, Dr. Turner did not remember being advised of the "bystander CPR," or CPR started by the family, and admitted he could not speak about the home interventions attempted before the victim arrived at the hospital. With the victim in his care for thirty-five minutes and after a thorough examination, Dr. Turner testified that in his report he noted no bruising, no soft tissue swelling, and no injuries, trauma or deformities on the victim.

On redirect examination, Dr. Turner agreed that a bruise from an injury would not appear for several hours, and there is no difference between the bruising appearing after an injury to a living child and the bruising appearing post-mortem after an injury to a child shortly before death. He also agreed that bruises tended to worsen over time.

Dr. Adele Lewis, an Assistant Medical Examiner for the Davidson County Medical Examiner's Office, was declared by the trial court to be an expert in the field of forensic pathology. She performed the autopsy on the victim on June 4, 2008. Dr. Lewis summarized that nine of the victim's organs had contusions, hemorrhages or lacerations, and the victim's ribs had thirty or more fractures. The victim's brain showed deep bruising inside the scalp, subdural hematomas or fresh hemorrhages, subarachnoid hemorrhages (a deeper layer of the brain), optic nerve hemorrhaging, and multiple hemorrhages within both eyes, all of which were associated with shaking or shaken impact syndrome and not resuscitative measures. Dr. Lewis opined that an infant with these injuries could live "[p]robably only a matter of a few hours, at most" without medical intervention.

On cross-examination, Dr. Lewis acknowledged, "I'm speculating based on my medical training and experience, yes." She admitted that she did not talk with any of the witnesses and could not say what the specific mechanism of the injuries was. However, she testified, "But I can say to a reasonable degree of certainty and actually beyond that, that these are inflicted injuries."

On redirect examination, Dr. Lewis testified that an adult's hands are large enough to go around the victim's torso to inflict these injuries and that this type of assault would not necessarily cause a lot of noise. The injury patterns were consistent with patterns she observed in other cases and also documented in medical literature. Dr. Lewis personally performs approximately thirty to forty autopsies on children each year, and her office

performs approximately 150 autopsies on children per year, the majority of whom received CPR.

The State also presented Dr. Mark William Becher, director of neuropathology at Vanderbilt University Medical Center, who was "responsible for the diagnoses of all specimens from the brain, spinal cord, from surgery and autopsy" and also provided consultation services to the Davidson County Medical Examiner's Office. His examination of the victim was limited to the brain, spinal cord, and eyes. Dr. Becher testified that he found hemorrhages beneath the dura and beneath the arachnoid layer, which are referred to as subdural and subarachnoid hemorrhages respectively, in "multiple locations, multiple parts of the brain, multiple sides." He characterized the victim's hemorrhages on the spectrum of severity as "very extreme." He further opined that the subdural and subarachnoid hemorrhaging were not injuries caused by any autopsy procedure conducted by Dr. Lewis.

Dr. Becher's examination also revealed limited abnormal concentrations of protein in the corpus callosum, an accumulation of processes in the midline of the brain and the pons, an area in the brain stem. Normally, he explained, these proteins are equally concentrated throughout the brain. The significance of the victim's limited abnormalities is that they "raise the mechanism of acceleration and deceleration injury of the axons." He explained that an "acceleration and deceleration injury to the brain [occurs] when rapid forces are made of the brain so that it rapidly goes forward and stops, sloshes against the skull[,] . . . comes back[,] and then goes back the other way again rapidly . . . ." He also opined that the rotational component is important because it was significant to the damage in the pons. Dr. Becher opined that there was evidence of an acceleration and deceleration injury to the victim's brain, and the constellation of all the features were consistent with the mechanism of shaken baby syndrome.

Dr. Becher acknowledged that he was unable to assess how long this mechanism lasted, stating, "We cannot assess time, but we are able to assess severity, so this, to me, is a very severe injury." He further explained, with regard to his examination of the victim's eyes, that "[b]oth eyes had acute hemorrhages of the retina as well as the optic nerves, the nerves that come off the back of the eye." He stated that the extent of hemorrhages in both retinas and both optic nerves qualified as "traumatic."

On cross-examination, Dr. Becher admitted he was not at the scene of the incident and did not see anyone physically shake, squeeze, or strike the victim. He said, "My examination is limited to the fixed autopsy." He acknowledged reading the autopsy overview from Dr. Lewis, learning Dr. Lewis's summary noted broken ribs and other injuries, and knowing Dr. Lewis had classified the case as a homicide. When asked if he believed advanced cardiac life support can cause retinal hemorrhaging, Dr. Becher replied, "There are reports in the

literature, and in practice we see hundreds of people who have resuscitation ten times as long as you described in this case and none of them have it in my experience." Dr. Becher did not examine the victim's heart and did not think he was qualified to address the condition of hypertrophic cardiomyopathy because he was not a heart specialist.

On redirect testimony, Dr. Becher agreed that the mechanism of grabbing a child about the chest and shaking the child backwards and forwards is a mechanism that on occasion produces rib fractures. He further testified that reviewing Dr. Lewis's findings did not affect his opinion in any way and that occasionally his examination results in a different opinion from his colleagues.

On recross examination, Dr. Becher responded to the questioning of his qualifications to offer an opinion as to the squeezing mechanism or shaken baby syndrome causing rib fractures and stated that when they are presented with the overview of cases, they commonly find bruises on the arms or fractures of the ribs as a mechanism of holding the baby. He continued, stating that observing the neurological findings, he considered himself qualified to include that in his summary because there is no speciality of rib fractures. He further acknowledged that he was not an orthopedic doctor.

Dr. Thomas Young, a forensic pathologist in private practice, is a former chief medical examiner in Kansas City, Missouri. Dr. Young was an independent consultant. The trial court allowed Dr. Young to testify as an expert for the defense in the field of forensic pathology.

Dr. Young testified, "It is my opinion, made to a reasonable degree of medical certainty, that the cause of death is a cardiac arrest from hypertrophic cardiomyopathy, a natural disease, and that the manner of death is natural." Dr. Young explained that "whatever blood that is collecting in its body cavities is from oozing from repetitive chest compressions." Dr. Young testified that the victim did not have skull fractures or tears in or bleeding beneath the scalp that would indicate an impact and that the injuries were "what you would expect in a child that had a sudden heart stoppage from an abnormality of the heart." He contributed the internal bleeding to chest compressions, stating, "[I]f you're propelling blood through vessels that are leaking because they're starving from oxygen, there's going to be oozing." Dr. Young also blamed the victim's retinal hemorrhaging on prolonged CPR, explaining that just as the skin bruises due to CPR, the retinas are also susceptible to "oozing" as a result of repetitive chest compressions. Dr. Young attributed many of the victim's injuries to CPR but stated that "[s]cientists, for the most part, do not believe that cardiopulmonary resuscitation causes severe internal injuries."

Dr. Young disagreed with Dr. Lewis's testimony regarding shaken baby with impact, opining that "[n]obody has ever seen any child shaken violently like this to cause these kinds of injuries." He continued, "In fact, there really hasn't been any kind of study. There have basically been studies to demonstrate, even as far back as 1987, that if you were to shake the child hard enough, you would break the neck first before there would be any kind of lesion in the head."

Dr. Young summarized his opinion, stating, "The child [had] a hypertrophic cardiomyopathy, an inherited heart condition that [led] to sudden heart stoppage and sudden cardiac death. And that is my opinion made to a reasonable degree of medical certainty."

On cross-examination, Dr. Young admitted he resigned in December 2006 as a medical examiner in Jackson County, Missouri, as a result of a letter to the Jackson County Executive signed by six prosecutors from separate jurisdictions complaining they could not rely on his opinions.

Dr. Young did not place importance on appellant's changing his account of the victim's injuries. He stated that forensic pathologists look at witness accounts and the medical findings to determine whether the two are consistent. He further testified, "I don't make diagnoses of child abuse from an autopsy. That's improper. That's speculative. Basically, I just compare the story and the account with the findings and I tell you whether it's consistent or inconsistent. And that's basically the limit of what I can do as a scientist, as a person who wasn't there to see what happened." Dr. Young declined to testify as to shaken baby syndrome, stating, "I don't make calls of shaken baby syndrome, never have, never will . . . . Never. I don't do shaken baby syndrome. I don't even think it exists . . . . Shaken baby syndrome currently is a very, very controversial area. And even though the pediatric community is full fledged behind the shaken baby thing, there is – in the medical examiner community, there's quite a bit of division on the whole thing."

The State recalled Dr. Lewis, who further examined Dr. Young's diagnosis that he made based on a slide of heart tissue and two medical articles. She explained:

> Those articles are explaining that it's very difficult or impossible, actually, to make the diagnosis of hypertrophic cardiomyopathy in this particular area of the heart, the interventricular septem because that area of the heart normally has myocyte disarray or the fibers of the heart are disorganized. So the diagnosis cannot be made from looking at a section taken from the interventricular septum and that's what Dr. Young was trying to do. It's sort of a rookie mistake.

She responded to Dr. Young's observation that one section of the heart showed a heart condition, opining, "that he has taken the section of the exact place that the articles explain is fraught with false positives and interpreted that as a positive finding."

At the close of the evidence, the jury deliberated and returned verdicts of guilt on the lesser-included offenses of reckless aggravated assault (three counts), attempted aggravated child neglect, reckless homicide, and a verdict of not guilty on the count of felony murder during perpetration or attempt to perpetrate aggravated child neglect. The trial court sentenced appellant to four years on each of the counts of aggravated assault and reckless homicide and twelve years for attempted aggravated child neglect. It merged the convictions for reckless aggravated assault with reckless homicide and ordered that the four-year sentence run consecutively to the twelve-year sentence, for an effective sentence of sixteen years in incarceration.

III. Analysis

A. Sufficiency of the Convicting Evidence

1. Standard of Review

The standard for appellate review of a claim of insufficiency of the State's evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). To obtain relief on a claim of insufficient evidence, appellant must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977).

On appellate review, "'we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom.'" *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). This court presumes that the jury

has afforded the State all reasonable inferences from the evidence and resolved all conflicts in the testimony in favor of the State; as such, we will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at 379; *Cabbage*, 571 S.W.2d at 835; *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Because a jury conviction removes the presumption of innocence that appellant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the convicted appellant, who must demonstrate to this court that the evidence is insufficient to support the jury's findings. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)).

## 2. Attempted Aggravated Child Neglect

Although convicted on five counts of a six-count indictment, appellant challenges the sufficiency of the convicting evidence solely with respect to his conviction for attempted aggravated child neglect.

The statutory elements of aggravated child abuse and neglect define the offense as the knowing abuse or neglect of a child "so as to adversely affect the child's health and welfare" that "results in serious bodily injury to the child." Tenn. Code Ann. §§ 39-15-401(b), -402 (a)(1) (2010). The State indicted appellant for three counts of aggravated child abuse under this statute and one count of aggravated child neglect. Our supreme court has held that a

> defendant may be criminally liable for attempted child neglect under Tennessee Code Annotated section 39-12-101(a)(3), so long as the State proves (1) that the defendant's conscious object or desire was to engage in conduct constituting child neglect; (2) that he took a substantial step toward the commission of that offense; and (3) that his [child was] six years of age or less.

*State v. Mateyko*, 53 S.W.3d 666, 677 (Tenn. 2001). The court further concluded that "the State has no burden under section 39-12-101(a)(3) to show that the defendant intended that his children suffer adverse effects to their health and welfare." *Id.* at 676-77.

Viewing the evidence in the light most favorable to the State, the evidence at trial established that the victim was left in the sole care of appellant on the day she died. Although another individual was in the home at the time of the incident, she neither cared for the child nor witnessed any incident involving the child. When Vanessa and Ms. Sudberry left the home on the morning in question, the child was alive and healthy. Shortly after they returned, the victim was lifeless and her lips were blue. In the intervening time, appellant was practically alone with the victim. The State presented medical testimony that

-14-

the victim endured several injuries, any number of which could have been the cause of death. The jury's verdicts of guilt of reckless aggravated assault established, at a minimum, that the victim suffered her injuries at the hands of appellant. Being aware of the victim's injuries, appellant never summoned help by calling out to Ms. Woods or by calling 9-1-1. Not until his mother and Vanessa arrived home did he acknowledge that the victim was in distress. Dr. Lewis testified that without medical treatment, the victim could have survived for a few hours, at most. Testimony at trial established that from the time the 9-1-1 call was placed until the time police arrived, approximately six minutes elapsed. Emergency medical personnel arrived approximately two to three minutes after that. Appellant failed to take the necessary steps to seek medical attention for the victim, and the evidence at trial established that his failure adversely affected the child's welfare, resulting in serious bodily injury, in this case death, to the child. Appellant is not entitled to relief on this issue.

## B. Claim of Double Jeopardy for Convictions of
## Reckless Aggravated Assault and Attempted Aggravated Child Neglect and/or
## Reckless Homicide and Attempted Aggravated Child Neglect

In this issue, appellant claims two double jeopardy violations. He first claims that his convictions for reckless aggravated assault and attempted aggravated child neglect do not pass constitutional muster and violate the prohibition against double jeopardy. He next contends, in the alternative, that should this court instead review the convictions of reckless homicide and attempted aggravated child neglect for double jeopardy, both convictions cannot stand. Notably, he does not challenge the convictions for reckless aggravated assault in light of his conviction for reckless homicide, ostensibly because the most significant sentence, that of twelve years, is attached to the conviction for attempted aggravated child neglect. We address each combination of convictions in turn.

### 1. Standard of Review

Both parties to this appeal thoroughly outlined and applied our supreme court's opinion in *State v. Denton*, 938 S.W.2d 373, 378-81 (Tenn. 1996), to the facts of this case. Through no fault of their own, the parties have applied a standard of review that is no longer in effect in our state. *See State v. Watkins*, 362 S.W.3d 530 (Tenn. 2012). The supreme court's *Watkins* opinion was released on March 9, 2012, long after the parties' briefs were filed. *Watkins* changed our State's double jeopardy analysis and abrogated the *Denton* rule.

In *Watkins*, appellant was indicted for felony murder and aggravated child abuse and convicted of the lesser included offense of reckless homicide and aggravated child abuse as charged. *Id.* at 538. On direct appeal, this court found that the dual convictions violated the prohibition against double jeopardy, merged the convictions, and remanded the case to the

trial court for resentencing. *Id.* Our supreme court granted the State permission to appeal the issue of double jeopardy. *Id.*

The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, provides that "[n]o person shall . . . be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V. Courts have interpreted the Double Jeopardy Clause as providing three distinct protections: "(1) protection against a second prosecution for the same offense after acquittal; (2) protection against a second prosecution for the same offense after conviction; and (3) protection against multiple punishments for the same offense." *Watkins*, 362 S.W.3d at 541 (citations omitted). "The United States Supreme Court has declared that '[w]ith respect to cumulative sentences imposed in a single trial, the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended.'" *Id.* at 542 (quoting *Missouri v. Hunter*, 459 U.S. 359, 366 (1983)). In such cases, also known as "single prosecution cases," the Double Jeopardy Clause functions to prevent trial courts from fixing punishments in excess of that which was authorized by the legislature. *Watkins*, 362 S.W.3d at 542. "Single prosecution cases" lend themselves to claims of multiple punishment claims in two distinct ways, "unit-of-prosecution" and "multiple description" claims. *Id.* at 543. "Unit-of-prosecution claims arise when defendants who have been convicted of multiple violations of the same statute assert that the multiple convictions are for the 'same offense.'" *Id.* Our appellant at bar, as appellant in *Watkins*, was convicted of violating two different statutes, requiring this court to employ an analysis of a "multiple description claim" on direct appeal. *See id.* "Multiple description claims arise in cases in which defendants who have been convicted of multiple criminal offenses under different statutes allege that the convictions violate double jeopardy because the statutes punish the 'same offense.'" *Id.* at 544.

In *Watkins*, our supreme court held:

> In multiple description cases, when determining whether two statutes define the same offense, the United States Supreme Court long ago declared that "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not."

*Id.* at 544 (quoting *Blockburger v. United States*, 284 U.S. 299, 304 (1932)). An analysis of *Blockburger* examines "the statutory elements in the abstract, without regard to the proof offered at trial in support of the offenses." *Watkins*, 362 S.W.3d at 544. Under *Blockburger*, "[i]f each offense includes an element that the other offense does not, 'the *Blockburger* test

is satisfied, notwithstanding a substantial overlap in the proof offered to establish the crimes.'" *Id.* (quoting *Iannelli v. United States*, 420 U.S. 770, 785 n.17 (1975)); *see also Illinois v. Vitale*, 447 U.S. 410, 416 (1980) (noting that *Blockburger* "focuses on the proof necessary to prove the statutory elements of each offense, rather than on the actual evidence to be presented at trial"). Our supreme court opined:

> The *Blockburger* test has been credited with serving at least two purposes. First, the *Blockburger* test is described as remaining "loyal" to the text of the Double Jeopardy Clause, which proscribes multiple punishment for the "same offense" and does not proscribe multiple punishment for the "same conduct." Second, the *Blockburger* test has been characterized as preserving the appropriate separation of powers by focusing the analysis upon legislative intent, rather than upon a defendant's conduct or the proof introduced at a particular trial.

> The *Blockburger* test also has been described as promoting "two important practical implications." First, because the *Blockburger* test evaluates the statutory elements of the offenses without reference to the proof offered at trial, "a motion to dismiss one count or one indictment based on multiple punishment grounds can be decided prior to trial by simply comparing the statutes, and a defendant who is charged improperly will not have to undergo the anxiety of a trial before the error is redressed." Second, because the *Blockburger* test focuses on statutory elements rather than proof, "a court can review a multiple punishment claim without a time-consuming review of the trial transcript."

*Watkins*, 362 S.W.3d at 544-45.

Application of *Blockburger* involves a two-prong analysis; courts must determine the threshold inquiry under *Blockburger*, which is "whether the alleged statutory violations arise from 'the same act or transaction.'" *Id.* at 545. If the answer is negative, there cannot be a violation of double jeopardy, thus courts may end the analysis here. *Id.* If the answer is affirmative, a double jeopardy violation *could* be present, and the court must look to the second factor of *Blockburger*. *Id.* (emphasis added). "Where the threshold is met, meaning the convictions arose from the same act or transaction, a court next examines the statutes to determine whether the crimes of which the defendant was convicted constitute the same offense." *Id.* (citing *Blockburger*, 284 U.S. at 304). If each offense includes an element not contained in the other offense, the statutory offenses are distinct. *Id.* at 545-46 (citing *Blockburger*, 284 U.S. at 304). In this case, courts presume that the legislative body intended to allow for multiple or separate punishments for the offenses. *Id.* at 546.

After reviewing the proper application of *Blockburger* to claims of double jeopardy, our supreme court noted that Tennessee had not previously adopted the *Blockburger* test but rather employs "a unique test consisting of four factors that are weighed to determine whether multiple convictions violate double jeopardy." *Id.* at 547; *see State v. Denton*, 938 S.W.2d 373, 381 (Tenn. 1996). The first step under the four-prong *Denton* test requires our courts to compare the statutory elements "in the abstract," as directed by *Blockburger.* *Watkins*, 362 S.W.3d at 547. Next, courts look to *Duchac v. State*, 505 S.W.2d 237 (Tenn. 1973), to consider whether the offenses are proven by the same evidence. *Id.* Third, our courts "consider whether the offenses involved multiple victims or discrete acts." *Id.* "Finally, Tennessee courts determine whether the purpose of the respective statutes is the same or different." *Id.* (citing *Denton*, 938 S.W.2d at 381). "'No single aspect of this analysis is given controlling weight,'" and "'each factor must be weighed and considered in relation to the others.'" *Id.* (quoting *Cable v. Clemmons*, 36 S.W.3d 39, 42 (Tenn. 2001)).

The *Watkins* court reviewed several difficulties inherent in our state's current analysis of double jeopardy claims: (1) "its application produce[s] inconsistent results that defy reconciliation;" (2) "the test itself suffers from analytical defects and an incongruity with the key constitutional consideration in multiple punishment cases—that of ascertaining legislative intent;" (3) "the *Denton* test fails to focus sufficiently upon the distinct categories of multiple punishment claims—unit of prosecution and multiple description;" and (4) "the *Denton* test rests upon an uncertain constitutional foundation." *Watkins*, 362 S.W.3d at 549-50. The court next opined, "Given the analytical shortcomings of the *Denton* test[,] . . . we conclude that the time has come to abandon the *Denton* test. We adopt the *Blockburger* same elements test currently utilized by the federal courts and the vast majority of our sister states." *Id.* at 556. The supreme court concluded that the *Blockburger* test can be applied in "a more straightforward manner" in determining "whether multiple convictions under different statutes violate the state constitutional double jeopardy prohibition against multiple punishment." *Id.* Our court determined that

> [i]n nearly all cases involving multiple description claims, application of the *Blockburger* test will provide a definitive answer to the question of whether the Legislature intended to permit multiple convictions under separate statutes. In the rare case where doubt as to legislative intent remains after application of the *Blockburger* test, courts may consider other evidence of legislative intent, including the purposes and history of the relevant statutes.

*Id.* at 557-58. Thus, for purposes of appellate review, this court will employ the *Blockburger* analysis adopted by the Tennessee Supreme Court without regard to *Denton* or *Duchac*.

2. Reckless Aggravated Assault and Attempted Aggravated Child Neglect

Appellant first argues that convictions for reckless aggravated assault and attempted aggravated child neglect run afoul of the prohibition against double jeopardy.

Reckless aggravated assault as it applies to this case is defined by Tennessee Code Annotated section 39-13-102(a)(2)(A) as the reckless commission of assault (causing bodily injury to another) which results in serious bodily injury to another. *See also* Tenn. Code Ann. § 39-13-101(a)(1) (2010). The statutory elements of aggravated child abuse and neglect define the offense as the knowing abuse or neglect of a child "so as to adversely affect the child's health and welfare" that "results in serious bodily injury to the child." *Id.* §§ 39-15-401(b), -402(a)(1).

A comparison of the two statutes reveals that attempted aggravated child neglect is limited to victims who are "children," i.e., under the age of eighteen years.[3] Reckless aggravated assault contains no such limitation. Moreover, aggravated child neglect is founded upon "neglect," or an absence of action, which leads to serious bodily injury. Reckless aggravated assault is based upon "causing" serious bodily injury to another, an affirmative action.

Each of the offenses includes an element that is different from the other offense. Neither offense is a lesser included offense of the other. We thus conclude that our legislature intended to permit multiple convictions in this context. *See Watkins*, 362 S.W.3d at 558. Because appellant's convictions for these two offenses are not prohibited by federal or state prohibitions against double jeopardy, appellant is not entitled to relief.

3. Reckless Homicide and Attempted Aggravated Child Neglect

In *Watkins*, our supreme court developed the procedure to be followed in determining claims of double jeopardy. Notably, it did so in the context of a claim involving reckless homicide and attempted aggravated child abuse. In reviewing the claim under *Blockburger*, the court held:

> Applying the foregoing principles in this case, we first consider whether the defendant's dual convictions arose from the same act or transaction. Here, there was only one victim, and Defendant was charged with committing both

---

[3] Child abuse and child neglect or endangerment is a Class A misdemeanor if the child is less than eighteen years of age. Tenn. Code Ann. § 39-15-401(b) (2010). If the child is eight years old or younger, the penalty then increases to a Class E felony. *Id.*

offenses on August 30, 2004, without reference to any specific or discrete acts. Thus, the threshold is surpassed, meaning the potential for a double jeopardy violation exists in this case. The General Assembly has not expressed its intent either to permit or to preclude dual convictions of reckless homicide and aggravated child abuse. Thus, we must next examine the statutes defining the crimes of which the defendant was convicted in order to discern legislative intent.

Reckless homicide is statutorily defined as the "[r]eckless killing of another." Aggravated child abuse as charged in this case is statutorily defined as follows: "A person commits the offense of aggravated child abuse . . . who commits the offense of child abuse . . . and . . . [t]he act of abuse . . . results in serious bodily injury to the child . . . " Child abuse . . . occurs when "[a]ny person . . . knowingly, other than by accidental means, treats a child . . . in such a manner as to inflict injury . . . " At the time of this offense, "serious bodily injury" was defined as including a "substantial risk of death," "[p]rotracted unconsciousness," "[e]xtreme physical pain," "[p]rotracted or obvious disfigurement," or "[p]rotracted loss or substantial impairment of a function of a bodily member, organ or mental faculty."

Obviously, the definitions of reckless homicide and aggravated child abuse differ markedly. Reckless homicide requires proof of a killing; aggravated child abuse does not. Aggravated child abuse requires proof that the victim was a "child," that is, a person less than eighteen years of age; reckless homicide has no age-based element. Having applied the *Blockburger* test, we conclude that the defendant's convictions of reckless homicide and aggravated child abuse are not the same offenses for purposes of double jeopardy. Each offense includes an element different from the other offense. Neither offense is a lesser included of the other. Accordingly, we conclude that the General Assembly intended to permit multiple convictions in this context. Thus, we hold that Defendant's dual convictions do not offend either the Double Jeopardy Clause of the Fifth Amendment or article I, section 10 of the Tennessee Constitution.

*Id.* at 558 (internal citations omitted).

The same rationale applies to the instant case. Although appellant was convicted of attempted aggravated child neglect, the offenses of aggravated child abuse and aggravated child neglect are codified in the same statute, Tennessee Code Annotated section 39-15-402 (2010). Analysis of the elements, for purposes of a *Blockburger* analysis, are the same. The

outcome of this case is dictated by our supreme court's holding in *State v. Watkins*; as such, we conclude that appellant's convictions for reckless homicide and attempted aggravated child neglect do not violate the double jeopardy clauses of either the United States or the Tennessee Constitution, and appellant is entitled to no relief.

### C.  Election of Act(s) Relied Upon for Aggravated Child Neglect

Appellant argues that the trial court erred in denying his motion to compel the State to make an election of act(s) underlying the indictment for aggravated child neglect.  The trial court granted the motion with respect to the counts of aggravated child abuse but denied it with respect to aggravated child neglect.  Appellant contends that the trial court's error permitted the jury to deliberate on different facts and thus created the potential for a non-unanimous verdict on that count.

The State argued to the jury that although appellant claimed the victim's injuries were accidentally inflicted, "he can't rely on that, because he'd still be guilty of neglect, because he did absolutely nothing to provide medical treatment for that child when in his own words, she was unconscious and not breathing."  The trial court charged the jury with respect to child neglect:

> Neglect is a continuing course of knowing conduct beginning with the first act of omission that causes adverse affect [sic] to [the victim] and her welfare. Neglect is an act of omission.  Neglect can occur when an parent or guardian neglects, fails[,] or refuses to provide the necessary medical, surgical, institutional[,] or hospital care for a child.

The trial court's instruction to the jury was proper and appropriately limited the facts upon which the jury could render its verdict on aggravated child neglect.

In a similar case, our supreme court opined:

> This Court has consistently held that when the evidence indicates the defendant has committed multiple offenses against a victim, the prosecution must elect the particular offense as charged in the indictment for which the conviction is sought. This election requirement serves several purposes. First, it ensures that a defendant is able to prepare for and make a defense for a specific charge.  Second, election protects a defendant against double jeopardy by prohibiting retrial on the same specific charge. Third, it enables the trial court and the appellate courts to review the legal sufficiency of the evidence. The most important reason for the election requirement, however, is that it

ensures that the jurors deliberate over and render a verdict on the same offense. This right to a unanimous verdict has been characterized by this Court as "fundamental, immediately touching on the constitutional rights of an accused . . . ."

When the evidence does not establish that multiple offenses have been committed, however, the need to make an election never arises. To this end, this Court has made a distinction between multiple discrete acts that individually constitute separate substantive offenses and those offenses that punish a single, continuing course of conduct. In cases when the charged offense consists of a discrete act and proof is introduced of a series of acts, the state will be required to make an election. In cases when the nature of the charged offense is meant to punish a continuing course of conduct, however, election of offenses is not required because the offense is, by definition, a single offense.

. . . .

[A]s evidenced by . . . other statutes in the Tennessee Code, we hold that the General Assembly intended for the offense of aggravated child abuse through neglect to punish a continuing course of knowing conduct beginning with the first act or omission that causes adverse effects to a child's health or welfare.

Indeed, it would be an absurd construction to hold that criminal child neglect is complete as soon as the child's health and welfare are first adversely affected, especially when the child remains in this condition for a substantial period of time. Neglect simply does not lend itself to division into segments of discrete acts each having various points of termination. Rather, a more reasonable construction of the offense supports the view that the offense continues until the person responsible for the neglect takes reasonable steps to remedy the adverse effects to the child's health and welfare caused by the neglect.

*State v. Adams*, 24 S.W.3d 289, 294-96 (Tenn. 2000) (internal citations omitted). Further, this court has held:

Given the defendant's knowledge and awareness of the victim's obvious physical injuries, [his] decision to knowingly forego [sic] medical treatment, at whatever point in time [h]e made it, was child neglect. This

neglect continued until the victim ultimately died. In this case, the defendant's neglect was continuous and without interruption, and we cannot break the defendant's conduct into separate and discrete periods of time and space. Accordingly, we conclude that the state was not required to make an election of offenses, and the trial court did not commit an error in failing to require the State to make an election.

*State v. Martha Patlan*, No. M2011-01175-CCA-RM-CD, 2011 WL 2848395, at \*11-12 (Tenn. Crim. App. July 18, 2011) (internal citations and quotations omitted). Based on the foregoing authorities, the trial court correctly ruled that the State was not required to make an election on the offense of aggravated child neglect and properly instructed the jury. Appellant is not entitled to relief on this issue.

## D. Expert Testimony

Appellant argues that the trial court erred in admitting a comment made by the medical examiner during her testimony, characterizing it as testimony that "a changing or inconsistent version of events by a person suspected of child abuse is suggestive of non-accidental trauma."

We begin our analysis with the proposition that admissibility of expert testimony is governed by the Tennessee Rules of Evidence:

> If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

Tenn. R. Evid. 702. The trial court is vested with broad discretion in resolving questions regarding the admissibility of expert testimony. *State v. Copeland*, 226 S.W.3d 287, 301 (Tenn. 2007). On appellate review, we will not disturb a trial court's decision regarding the admission or exclusion of expert testimony absent an abuse of discretion. *State v. Scott,* 275 S.W.3d 395, 403 (Tenn. 2009). A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party. *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006) (citing *Howell v. State*, 185 S.W.3d 319, 337 (Tenn. 2006)).

Prior to trial, appellant filed a motion in limine seeking to exclude any medical testimony that appellant's changing his story several times was indicative of guilt. The trial

court held a hearing, after which it ruled that a doctor could testify that he or she considers a history that is inconsistent with the injuries as determining whether the injuries were intentional or accidental.

Both the State and appellant refer this court to an excerpt of the testimony of Dr. Adele Lewis, an expert in forensic pathology. The State's cited excerpt is lengthier than appellant's, thus, to distinguish between them, we emphasize appellant's quoted portion in italics below:

Q: Dr. Lewis, I think one of the things you mentioned is that you also, in addition to looking at the medical findings, have to look at her, consider the history that's provided to explain that.

A: Yes, absolutely.

Q: In formulating diagnosis of whether some – whether a child has non-accidental trauma or child abuse trauma, do you look at and evaluate whether the history is consistent or not with the nature of the injuries?

A: Yes.

Q: In this particular case, are you aware that Mr. Sudberry provided varying histories to police officers in connection with the investigation?

A: Yes. I was aware that the story had changed several times.

Q: Initially, Mr. Sudberry said, I don't have any idea, nothing happened to the child, the child was perfectly fine.

A: Yes.

Q: That he attributed many of the injuries, if not all of the injuries, to resuscitative measures involving rescue personnel?

A: I learned that later, yes.

Q: That he provided a history, ultimately, to police officers that he had fallen on the stairs while holding the child and fell on her with his knee?

A:     And again, I learned that after the autopsy, yes.

Q:     And that he had provided a statement where he claimed to have shaken the baby mildly in order to revive the baby.

A:     Yes.

Q:     Were any of those explanations, in your opinion, consistent with the nature of injuries that [the victim] sustained?

A:     No, they are not.

Q:     *The fact that somebody provides a history that is inconsistent with those injuries, how does that factor into the diagnosis of non-accidental trauma from a medical standpoint?*

A:     *Well, not only is changing stories or varying histories suggestive of an abuse or inflicted injury, injuries – or histories that are not supportive of the injuries that we see. So if someone says, oh, the child rolled off the sofa and they have injuries like this, that's clearly not consistent with this type of injuries. So we have a pattern of injuries here, the severity of injuries here, and the location of these injuries that all indicate a non-accidental source.*

Here, appellant urges this court to review Dr. Lewis's few words in the answer above in a vacuum in support of his position that she improperly testified with regard to behavioral characteristics of an accused. We decline to do so. The State reviewed appellant's different versions of the events to lay the foundation for asking Dr. Lewis if *any* of appellant's stories were consistent with the victim's injuries. Dr. Lewis began to answer the State's question cited above in a manner that was not responsive to the question asked, then she corrected herself to say "histories that are not supportive of the injuries." The State did not elicit testimony from Dr. Lewis regarding appellant's changing stories, and Dr. Lewis stopped herself mid-sentence before finishing her sentence.

The State's questioning of Dr. Lewis was permissible; the State must prove, usually through its medical experts, that the injuries sustained by the victim were not accidental. One commonly accepted method to do so is for the expert to offer testimony that the injuries in a particular case are inconsistent with the story or history provided by the accused. Our courts have approved this line of questioning in child abuse cases. *See State v. Hanson*, 279 S.W.3d, 265, 270-73 (Tenn. 2009) (noting that expert testimony that a child's injuries were

inconsistent with the factual scenario advanced by defendant was admissible to establish intentional injury as opposed to accidental injury); *State v. Henry Dequan Rhodes*, No. M1999-959-CCA-R3-CD, 2000 WL 264327, at *4 (Tenn. Crim. App. Mar. 10, 2000) (noting that at trial, expert testimony established that injuries were consistent with child abuse and inconsistent with an accidental injury).

Moreover, appellant was "acquitted" of aggravated child abuse and was instead convicted of the lesser-included offense of reckless aggravated assault on all three such counts, demonstrating that any error in Dr. Lewis's testimony regarding appellant's behavior was harmless. Appellant is not entitled to relief on this issue.

## E. Sentencing Issues

Appellant challenges the sentences imposed by the trial court on two grounds: (1) the trial court erred in imposing the maximum sentence on each conviction; and (2) the trial court erred in imposing consecutive sentences.

### 1. Standard of Review

In determining an appropriate sentence, a trial court must consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on mitigating and enhancement factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement the defendant makes on his own behalf as to sentencing; and (8) the potential for rehabilitation. Tenn. Code Ann. §§ 40-35-103(5), -113, -114, -210(b) (2010). In addition, "[t]he sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(4) (2010).

When imposing a sentence within the appropriate range of punishment for a defendant,

> the court shall consider, but is not bound by, the following advisory sentencing guidelines:
>
> (1)    The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum

length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

(2)     The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c) (2010).  From this, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" *State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008) (quoting Tenn. Code Ann. § 40-35-210(d)).

Pursuant to the 2005 amendments, the Sentencing Act abandoned the statutory minimum sentence and rendered enhancement factors advisory only.  *See* Tenn. Code Ann. §§ 40-35-114, 40-35-210(c) (2010).  The 2005 amendments set forth certain "advisory sentencing guidelines" that are not binding on the trial court; however, the trial court must nonetheless consider them.  *See id*. § 40-35-210(c).  Although the application of the factors is advisory, a court shall consider "[e]vidence and information offered by the parties on the mitigating and enhancement factors in §§ 40-35-113 and 40-35-114." *Id*. § 40-35-210(b)(5). The trial court must also place on the record "what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, to ensure fair and consistent sentencing." *Id*. § 40-35-210(e). The weighing of mitigating and enhancing factors is left to the sound discretion of the trial court. *Carter*, 254 S.W.3d at 345. The burden of proving applicable mitigating factors rests upon appellant. *State v. Mark Moore*, No. 03C01-9403-CR-00098, 1995 WL 548786, at *6 (Tenn. Crim. App. Sept. 18, 1995).  The trial court's weighing of the various enhancement and mitigating factors is not grounds for reversal under the revised Sentencing Act.  *Carter*, 254 S.W.3d at 345 (citing *State v. Devin Banks*, No. W2005-02213-CCA-R3-DD, 2007 WL 1966039, at *48 (Tenn. Crim. App. July 6, 2007), *aff'd as corrected*, 271 S.W.3d 90 (Tenn. 2008)).

When a trial court orders a sentence involving confinement, the court should consider whether: (A) "confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;" (B) "confinement is necessary to avoid depreciating the seriousness of the offense" or to "provide an effective deterrence to others likely to commit similar offenses;" or (C) less restrictive measures have been frequently or recently applied to defendant unsuccessfully.  Tenn. Code Ann. § 40-35-103(1) (2010).

When an accused challenges the length and manner of service of a sentence, this court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness.  *State v. Bise*, ___ S.W.3d ___, No.

E2011-00005-SC-R11-CD, 2012 WL 4380564, at *17 (Tenn. Sept. 26, 2012). If a trial court misapplies an enhancing or mitigating factor in passing sentence, said error will not remove the presumption of reasonableness from its sentencing determination. *Id.* at 17. This court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* Moreover, under such circumstances, appellate courts may not disturb the sentence even if we had preferred a different result. *See Carter*, 254 S.W.3d at 346. The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401 (2010), Sentencing Comm'n Cmts.; *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

## 2. Maximum Sentences

Appellant was convicted of three counts of reckless aggravated assault and one count of reckless homicide, Class D felonies that carry a sentence of two to four years as a Range I offender. Attempted aggravated child neglect of a child less than eight years of age is a Class B felony, for which the range of punishment as a Range I offender is eight to twelve years. The trial court sentenced appellant to the maximum allowable sentence on each conviction. Appellant argues that his sentences are excessive and inconsistent with the purposes of the sentencing guidelines. *See* Tenn. Code Ann. § 40-35-401(b)(2), (3) (2010).

In arriving at the appropriate sentence, the trial court considered, on the record, the appropriate factors set forth by the sentencing guidelines. *See* Tenn. Code Ann. §§ 40-35-103, -210 (2010). The court next reviewed appellant's criminal history to determine his offender range. The trial court noted one prior conviction for felony child abuse, several misdemeanor convictions, and a conviction for statutory rape. It sentenced appellant as a Range I offender.

The court then considered applicable enhancing and mitigating factors. As enhancing factors, the trial court found that appellant had a previous history of criminal convictions or behavior greater than those necessary to establish the appropriate range of punishment; that the victim was particularly vulnerable because of age; that appellant allowed the victim to be treated with exceptional cruelty during the commission of the offenses; that appellant had previously failed to comply with the conditions of a sentence involving release into the community (probation); that appellant had no hesitation about committing a crime when the risk to human life was high; that appellant was serving a sentence of probation when he committed the crimes; and, that appellant abused a position of private trust, i.e, he was the victim's father. Tenn. Code Ann. §§ 40-35-114 (1), (4), (5), (8), (10), (13)(c), (14) (2010). The court found no mitigating factors from the record.

Appellant specifically challenges the trial court's finding of enhancement factor (5), that appellant allowed the victim to be treated with exceptional cruelty, claiming that the evidence of cruelty failed to "demonstrate[ ] a culpability distinct from and appreciably greater than that incident to" the offenses. *See State v. Poole*, 945 S.W.2d 93, 98 (Tenn. 1998) (quoting *State v. Jones*, 883 S.W.2d 597, 603 (Tenn. 1994)). As in *Poole*, our analysis of the statutory offenses for which appellant was convicted reveals that "exceptional cruelty" is not an element of any of his convicted offenses. *See id*.; Tenn. Code Ann. § 35-13-102(a)(2)(A), -15-402(a)(1)[4], -13-215 (2010). However, "serious bodily injury" is an element of the offenses of reckless aggravated assault and attempted aggravated child neglect. Our supreme court's opinion in *Poole* held that "proof of serious bodily injury . . . does not necessarily establish the enhancing factor of exceptional cruelty" and that "the facts in a case may support a finding of 'exceptional cruelty' that 'demonstrates a culpability distinct from and appreciably greater than that incident to' the crime[s for which appellant was indicted]." *Id.* (citations omitted).

We conclude that the medical evidence at trial supports the trial court's finding of the enhancement factor that appellant allowed the victim to be treated with exceptional cruelty. In summary, the medical examiner testified that nine of the victim's organs had contusions, hemorrhages, or lacerations; the victim's ribs had thirty or more fractures; the victim's brain showed deep bruising inside the scalp, subdural hematomas, and subarachnoid hemorrhages; and the victim's eyes revealed optic nerve hemorrhaging and multiple hemorrhages within both eyes. This level of injury far exceeds the level of "serious bodily injury" required to sustain convictions for reckless aggravated assault and attempted aggravated child neglect. Appellant is not entitled to relief on this issue.

Appellant further contends that the trial court's finding of enhancement factor (10), that appellant had no hesitation about committing a crime when the risk to human life was high, was erroneous. Appellant correctly asserts that this enhancement factor is inapplicable to this case because "risk to human life" was inherent in the offenses, and the victim was the only individual at risk of being harmed.

> In general, factor (10) applies only where the facts that establish that the defendant created a high risk to human life also demonstrate a greater culpability than that incident to the offense underlying the enhancement. As a result, where a high risk to human life is inherent in the underlying

---

[4] The State indicted appellant for aggravated child neglect pursuant to Tennessee Code Annotated section 39-15-402(a)(1), which requires a finding of serious bodily injury, rather than section 39-15-402(a)(3), which requires a finding that the abuse or neglect was "especially heinous, atrocious, or cruel."

conviction, enhancement factor (10) applies only if the defendant disregarded a high risk to the life of a person other than the victim.

*State v. Lance Sandifer*, No. M2008-02849-CCA-R3-CD, 2010 WL 5343202, at *20 (Tenn. Crim. App. Dec. 21, 2010) (internal citations omitted), *perm. app. denied* (Tenn. May 26, 2011); *see State v. Jones,* 883 S.W.2d 597, 601 (Tenn. 1994); *State v. Zonge*, 973 S.W.2d 250, 259 (Tenn. Crim. App. 1997). The facts establish that the victim was the only individual at risk of harm from appellant's attack. Thus, the trial court incorrectly applied this enhancement factor.

Notwithstanding, the "trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 2012 WL 4380564, at *17. We conclude, after thorough review of the record, that the trial court did not "wholly depart" from the sentencing act, and we decline to adjust appellant's sentence. Appellant is not entitled to relief on the issue of excessive sentences.

### 3. Consecutive Sentences

The trial court ordered appellant's four-year sentence for the conviction for reckless homicide to run consecutively to his twelve-year sentence for attempted aggravated child neglect. Appellant argues first that the trial court erred in its application of one of the factors supporting consecutive sentencing and finally that the resulting sixteen-year sentence is "greater than that deserved for the offense committed" and is not "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(2), (4) (2010).

The determination of whether to order consecutive rather than concurrent sentences is a matter primarily within the discretion of the trial court. *See State v. Hastings*, 25 S.W.3d 178, 181 (Tenn. Crim. App. 1999). The procedure is governed by Tennessee Code Annotated section 40-35-115, which lists seven factors that are relevant to a trial court's sentencing decision. The court may order consecutive sentences if it finds by a preponderance of the evidence that one or more of the seven statutory criteria exists. Tenn. Code Ann.§ 40-35-115(b) (2010). Of the seven factors, the trial court found the following applicable to appellant's case:

(2) The defendant is an offender whose record of criminal activity is extensive; and

(4)     The defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high.

Appellant does not contest the trial court's finding of the first factor, but correctly notes that when a trial court applies section 40-35-115(4), the court, in addition to finding that a defendant is a "dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high," must also make a finding that consecutive sentencing is "necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences must reasonably relate to the severity of the offenses committed." *See State v. Wilkerson*, 905 S.W.2d 933, 939 (Tenn. 1995). He argues that the trial court failed to make the necessary *Wilkerson* findings. However, our review of the record contradicts appellant's assertions.

The sentencing hearing transcript reflects that the trial court, in finding that appellant is a dangerous offender, opined:

> The Court finds that confinement for an extended period of time is necessary to protect society, minors, babies, those are the ones he seems to perpetrate his crimes on through statutory rape, child abuse, reckless aggravated assault, reckless homicide, to protect society from his unwillingness to lead a productive life, which he has never really done. The defendant's resort to criminal activity and furtherance of anti-societal lifestyle; a child cries and he beats or kills it. The Court finds that the aggregate length of the sentence being 16 years is reasonably related to the offenses for which he stands convicted. Quite frankly, the Court feels that the sentence should be significantly greater than that, but unfortunately that is nothing that the Court can do [anything] about . . . , but I can assure you that for the brutality that was perpetrated upon this child that 16 years is a slap on the hand, which is not consideration he has ever given to the children that's been in his life, he doesn't believe in a slap on the hand; he believes in a brutal beating.

The trial court clearly and thoroughly made the requisite findings under *Wilkerson.* Following our review of the record, we conclude that the record supports the trial court's finding that appellant is a dangerous offender.

Appellant's final argument, that his sentence is excessive and in contravention of Tennessee Code Annotated section 40-35-103(2), (4), must also fail. In another child abuse case, our supreme court held, "Because the defendant, at a minimum, demonstrated extreme callousness toward the health and welfare of the victim, and the results were fatal, the trial

court, in our view, had a reasonable basis for imposing consecutive sentences." *State v. Dorantes*, 331 S.W.3d 370, 392 (Tenn. 2011). Following this precedent, we deny appellant relief on this issue.

## CONCLUSION

Following our thorough review of the record, the parties' briefs, and applicable case law, we discern no error and affirm the judgments of the trial court.


_____

ROGER A. PAGE, JUDGE